THE GEORGES CREEK COAL
AND IRON COMPANY
vs.
CHRISTIAN E. DETMOLD. } December Term, 1848.

[INJUNCTION—TRESPASS—WASTE—PRACTICE.]

Courts of equity will interfere, by injunction, even as against trespassers, if the acts done, or threatened to be done, to the property, would be ruinous and irremediable.

But, an injunction is not granted to restrain a mere trespass, where the injury

is not irreparable and destructive to the plaintiff's estate ; but is susceptible of perfect pecuniary compensation, and for which the party may obtain adequate satisfaction in the ordinary course of law.

In the case of waste, where there is a privity of title, as between tenants for life, or years, and the reversioner, it is not necessary for the plaintiff to show irreparable injury or destruction to the estate, to entitle him to the remedy by injunction.

But, as between strangers or parties claiming adversely, there is no distinction between trespass and waste ; and, in both cases, the injury must be shown to be irreparable, before this court will grant an injunction.

A bill filed by a corporation need not be under its corporate seal. That it is the bill of the corporation, is sufficiently vouched by the signature of the solicitor, whose authority to file it need not be exhibited.

---

[By the written agreement between these parties, dated the 11th of October, 1845, the plaintiff leased to the defendant, for the term of seven years, the furnace erected on the property of the plaintiff, known as the Lonaconing Furnace, together with certain rights and privileges therein enumerated.

Then follows a provision, giving the defendant exclusive use of the worked openings of the company, and the right to make other openings, &c.; and all timber necessary to the construction and maintenance of the works, mines and buildings, to be cut under the direction of the company. The defendant was to pay a nominal rent for the space of two years and two months from the date of the agreement, after which period he was to pay for the property, rights and privileges aforesaid, at the rate of one dollar per ton for pig or cast iron, in full for all materials mined by him and used in the manufacture of iron ; and for minerals and materials mined by him and sold to other persons he was to pay a mine rent of twenty-five cents per ton. It was further agreed, "that should a rail or other road be made by the company from the works at Lonaconing to the rail road now being constructed by the Maryland Mining Company, at any time within the said two years and two months, then the said rent of one dollar per ton should become payable on the completion of said road, provided, the transportation on said road be done for the defendant by the company, at a rate not exceeding two cents and a half per ton per mile."

It was also agreed, "that the said Detmold should be per-

mitted to make tram and other roads for the transportation of materials to and from the furnace and mines, but not so as to interfere with existing roads," &c.

There was a further stipulation, that the defendant should have the right to put up additional blast furnaces, &c.; and, it was provided, that if during the term of the agreement, the defendant should erect works for the manufacture of bar or malleable iron, then the company stipulated to execute to him a lease of ninety-nine years, renewable forever. There was then a provision, that at the expiration of seven years, (unless defendant should entitle himself to a renewable lease for ninety-nine years,) that the improvements and erections made by the defendant, (except dwelling houses,) and all rail or tram roads, other than those made with the tram-plates furnished by the company, should be restored by the defendant to the company, at a valuation to be put upon them by disinterested parties.

The defendant took possession under this agreement, and so continues to the present time ; but, on the 5th of September last, the complainant filed a bill in this court, charging the defendant with various acts, alleged to be violations of the contract, and of a nature which, in the opinion of the court, entitled the plaintiff to an injunction to prevent their repetition.

These acts were, first, the cutting down of wood and timber upon the lands of the plaintiff, for the purpose of erecting and constructing a saw mill, on ground adjacent to the furnace and steam engine by which the furnace is worked, with the design of employing the engine in working the saw mill ; and secondly, in cutting down wood and timber for the purpose of making a rail or tram road from the furnace, through the lands of the complainant, and other intervening lands of other parties to the rail road of the Maryland Mining Company, distant about seven miles from the furnace, and not touching at any point the lands of the complainant.

The bill alleges, that the agreement gives the defendant no authority to erect a saw mill on the lands of the complainant, or to cut wood and timber thereon for that purpose, or to make a rail or a tram road, of which the termini are not at the fur-

nace and at a mine, and which may not be necessary for the transportation of materials from the one terminus to the other; and, that the defendant is not authorized to make a road for the transportation of iron, the product of a furnace, to a market, which, the bill alleges, is the sole object in making the road in question.

It further alleges, that the lands have been already greatly wasted; and, that if the defendant is not restrained by the authority of this court, they will be irreparably wasted and injured, by cutting down and removing large masses of wood and timber, which defendant has already cut, and is yet engaged in cutting, so as, in the apprehension of the complainant, there will not be left upon the lands a sufficiency for its purposes, as an appendage to the furnace.

The bill, then, after charging that the defendant had, in the prosecution of his purpose to make the road, entered upon lands rented to other persons, and, thereby, impeded the complainant in collecting the rents, proceeds to charge that the erection and employment of the saw mill in the immediate vicinity of the steam engine, furnace and their dependant improvements, will expose them all to great hazard of loss, by fire, against which, there can be no adequate security.

An injunction was granted upon this bill, prohibiting the defendant from cutting down wood and timber, upon the lands of the plaintiff, for the purpose of constructing the saw mill, or making a tram or rail road from the furnace to the rail road of the Maryland Mining Company, or in any other direction, except to a mine on the lands of the plaintiff, or for any purpose other than the transportation of materials to and from said furnace and mine.

Upon the argument of the motion to dissolve the injunction, the Chancellor, after making a statement of the facts of the case, of which the above is in substance a copy, said:]

THE CHANCELLOR:

This injunction, in the view taken by me at the time, rested upon two very sufficient grounds, assuming the contract did

not authorize the defendant to erect a saw mill, in the particular location selected for it, nor to make a rail or tram road, and to cut wood and timber for the purpose upon the lands of the plaintiff, to connect with the road of the Maryland Mining Company. These grounds were, the danger to which the furnace and its dependant improvements would be exposed from fire, by the erection and working of the saw mill in their immediate vicinity; and the destruction of wood and timber to such an extent, as to leave the lands without an adequate supply for its purposes, as an appendage to the furnace.

It seemed to me very clear, that in whatever light the defendant might be viewed, whether as a mere stranger and trespasser, or whether there was privity of title between him and the complainant, the acts complained of were of that irreparably ruinous and destructive character, as to call for the preventive interposition of this court. There was a period, to be sure, when the courts were extremely reluctant, if not absolutely unwilling to interfere at all, as against a mere trespasser, however grievous the injury might be, upon the ground, as observed by Lord Thurlow, that the defendant being a mere stranger, might be turned out of the possession immediately.

But, there seems now to be no hesitation, whatever, to interfere, by injunction, even as against trespassers, if the acts done or threatened to the property would be ruinous and irremediable. 2 *Story's Equity*, secs. 928, 929; *Eden on Injunctions*, 193.

Chancellor Kent says, in *Jerome vs. Ross*, 7 *Johns. Ch. Rep.*, 333, that the common law remedy by action and the assessment of damages by a jury, is, in ordinary cases of trespass, found to be amply sufficient for the protection of property; and, that it was not advisable to introduce the chancery remedy, by injunction, and to call forth the power of the court, by attachment, fine and imprisonment, except in strong and aggravated instance of trespass, which go to the destruction of the inheritance, or where the mischief is remediless. He further observed, in the same case, that it is not sufficient, that the act be simply *per se* a trespass; but, it must be a case of mischief, and of ir-

reparable ruin to the property, in the character in which it has been enjoyed.

And, the Court of Appeals of this state, in the case of *Amelung* vs. *Seekamp*, 9 *G. & J.*, 468, adopting the language of Chancellor Kent, in Jerome vs. Ross, say, "that an injunction is not granted to restrain a mere trespass, where the injury is not irreparable and destructive to the plaintiff's estate ; but, is susceptible of perfect pecuniary compensation, and for which the party may obtain adequate satisfaction in the ordinary course of law.

I thought it, therefore, quite manifest, that if the erection and working a saw mill, in the immediate vicinity of the plaintiff's furnace, and its dependent improvements exposed them, as alleged, to great hazard by fire, and if the destruction of wood and timber, for making the road, would be so considerable as to leave an insufficient supply upon the lands, as an appendage to the furnace ; and assuming, as I did then assume, that the agreement between the parties gave the defendant no authority for these acts, that a clear case was made out for an injunction. It was a case of irreparable ruin to the property in the character in which it had been held and enjoyed, and not susceptible of perfect pecuniary compensation.

Much of the argument upon the motion to dissolve the injunction has turned upon the construction of the contract ; and I am free to confess, that there is much difficulty in putting an interpretation upon it which will reconcile its various provisions and make it conform to what may, reasonably, be supposed to have been in the contemplation of the parties at the time it was made.

Looking, exclusively, to the 5th article of the agreement; and it would seem very clear, that the defendant could make no tram or other road, except for the transportation of materials to and from the furnace and mines ; and yet, there are other provisions, from which the inference is very strong, that the right to make a road, by which the defendant could reach a market, was intended to be reserved to him. He had a right, for example, to mine and sell minerals and materials to other

persons, upon paying a stipulated mine rent to the plaintiffs, and a road, the termini of which should be a mine and the furnace, would avail him nothing, so far as this right is concerned. Again, the rent to be paid by the defendant was to be nominal for two years and two months, after which a substantial rent was to be paid ; but, it was provided, that if within the two years and two months, the plaintiffs should make a rail or other road from their works at Lonaconing to the rail road of the Maryland Mining Company, then the same identical rent should become payable as would have become payable at the expiration of the said period of two years and two months, provided, the transportation on said road should be done by the plaintiff for the defendant at the rate mentioned in the agreement. It would seem, therefore, that the payment of this substantial rent was in the view of the parties connected with the enjoyment of the right to reach the road of the Maryland Mining Company, and by it to get to market.

There are, however, other provisions in the contract which are calculated to lead us to a different conclusion ; and, if required not to put a construction upon it, I would look carefully into its several stipulations, and endeavor to arrive at the intentions of the parties, to be collected from the entire instrument. But, I do not think the decision of this motion requires me now to expound this contract.

If the defendant was a mere stranger and trespasser, it has been conceded, indeed since the case of Amelung vs. Seekamp it could not be denied, the plaintiff would not be entitled to what has been called the strong and menacing hand of an injunction, unless he could show a case of great and irremediable mischief, which damages could not compensate. But, it is supposed, that as in this case, the relation of landlord and tenant exists ; that is, there is privity of title, that the court will, by injunction, stay the commission of any act, which, when committed, would be *waste* at common law, and that, cutting down timber is such waste. Chancellor Kent has said, and cites authority to prove, that the American doctrine on the subject of waste is somewhat varied from the English law, and is

32*

more enlarged, and better accommodated to the circumstances of a new and growing country. 4 *Kent's Com.*, 76.

In discussing the remedies now resorted to for waste, he says, the ancient remedy by writ of estrapement, and writ of waste, at common law, are essentially obsolete, and the modern practice in this country as well as in England, is to have recourse to the prompt and efficacious remedy by an injunction bill, to stop the commission of waste, *when the injury would be irreparable*, or by a special action on the case, in the nature of waste, to recover damages. 4 *Kent's Com.*, 77, 78.

But, notwithstanding this remark, which was made, not with reference to a mere stranger or trespassèr, but as applicable to cases in which there was privity of title, I am of opinion, that the court will interfere much more readily in the latter, than in the former case, and, that it is only in the case of a mere trespass by a stranger, or person claiming adversely, that this court will withhold its arm, unless the trespass be productive of irreparable mischief or ruin ; or to prevent a multiplicity of suits, or where the interposition of the court is required by some very special circumstances. Such is the language of the Court of Appeals in Amelung vs. Seekamp, and the distinction between the case of a stranger entering upon land as a trespasser, and were this is privity of title, is clearly recognised by Chancellor Kent himself, in *Livingston* vs. *Livingston*, 6 *Johns. Ch. Rep.*, 497.

The counsel for the plaintiff insists, that, in the case of waste, it is not necessary to show irreparable injury or destruction to the estate, to entitle him to the remedy by injunction ; and it may be, that such is the rule, where there is privity of title, as between tenants for life or years, and the revisioner ; but, I am clearly of opinion, that, as between strangers, or parties claiming adversely, there is no such distinction between trespass and waste, and that in both, under such circumstances, the injury must be shown to be irreparable, before this court will grant an injunction.

Waste in timber, consists in cutting down, lopping, topping, or doing any act whereby it may be brought to decay, *Coke*

*Lit.*, 53 *A.* ; and yet it is impossible to maintain, that such waste, if committed by a mere stranger and trespasser, would justify this court in granting an injunction, unless it could be shown not to be susceptible of a perfect pecuniary compensation. The Court of Appeals have said otherwise—they have said, the injury must be shown to be irreparable, and destructive to the plaintiff's estate, and incapable of a perfect pecuniary compensation, in the ordinary course of law.

The answer in this case, denies the charge in the bill, that the cutting down the timber required for the construction of the road will do the plaintiff irreparable injury, or leave the lands without an adequate supply of wood and timber for its purposes as an appendage to the furnace, and I see nothing in the evidence to overthrow or destroy the effect of the answer.

It must, therefore, upon this motion, be assumed, that if the injunction is dissolved, the injuries complained of in the bill are not irreparable, but are susceptible of a perfect pecuniary compensation ; and if so, then it clearly follows, that the injunction must be dissolved, unless it can be supported upon the ground of privity of title, so as to exempt the defendant from an action of trespass for the damage, the principle being, that if adequate redress can be had at law, the hand of this court will not be extended to prevent the trespass.

It becomes, therefore, material to inquire, whether, with respect to the lands upon which this wood and timber are growing, the defendant can be regarded as a tenant to the complainant. For, if he be not a tenant, then conceding that irreparable injury need not be shown when there is privity to the title, to induce this court to interpose by injunction, but that it will interfere in this form in every case of waste at common law, still the writ of injunction would not be the appropriate remedy in this case.

Now, I do not understand that the plaintiff leased to the defendant any thing more than the furnace and its appendages, and some adjacent ground sufficient to facilitate the operations of the furnace. The other rights of the defendant, under the contract, are mere easements, or privileges, to be enjoyed,

many of them, under the direction of the complainant. The twelfth cause of the agreement declares, that it was the object of the company in entering into the agreement, among other things, to promote leases to other parties, and the entire frame of the instrument shows that such purpose was kept steadily in view.

The defendant was to have the privilege to cut timber on the lands of the company, (not within the limits of the demised premises,) necessary in the construction and maintenance of the works, mines and buildings; but this was a mere privilege, and did not constitute the defendant, in any sense, the tenant of the lands from which the timber was to be cut.

In the case of *Moats* vs. *Witmer*, 3 *Gill & Johns.*, 118, it was decided, that a party who had a right to enter upon premises, for a particular purpose, became a trespasser, and an action of trespass could be maintained against him, if he entered for a different purpose. That it was the *intention* of the defendant which gave character to the act of entry. If made for a purpose provided for in the agreement, it was of course innocent, if not, he subjected himself to be sued in trespass, and to the payment of damages commensurate with the injury. So here—the defendant, under the agreement, might cut down wood and timber for a particular purpose ; but, if he undertook to do so for another purpose, he is a trespasser, and must answer in damages for the wrongful act. It is the *purpose* for which the timber is cut, which gives complexion to the act. If the purpose be authorized, the act is rightful ; if not, he is a trespasser, and a jury would not fail to make him pay in damages, in proportion to the injury. A court of equity, it seems to me, would be passing beyond the boundaries which have been assigned to it, if it were, in such a case, to interpose its extraordinary power of arresting acts by injunction, and, if necessary, enforcing its prohibition, by attachment, fine and imprisonment.

Thinking, therefore, that the plaintiff has not made out a case of irremediable injury, so far as the cutting wood and timber is concerned, for making the road, and that the courts of law, if

such cutting is not authorized, are quite competent to give redress, that part of the injunction must be dissolved.

With regard to the injunction to prevent the cutting wood and timber, for the purpose of erecting a saw mill on the lands, it appears, by the answer and evidence, that the mill was complete before the service of the injunction, at least so far finished as not to require any further use of timber, nothing being necessary but putting the saw in the frame, and placing the band on the wheel. The injunction, therefore, in this particular, comes too late.

That part of the bill which alleges the danger from fire to the furnace, and other improvements caused by the working of the mill, is explicitly contradicted by the answer, and the evidence tends rather to sustain than to weaken the force of the contradiction. The complainant's counsel, apparently conceding that the testimony of the witnesses is against him upon this point, insists that in the nature of things, the collection of a quantity of combustible materials, in the vicinity of the furnace, must increase the danger from fire. Such would ordinarily seem to be the case, but I cannot bring myself to think, that it would be safe in the court, (unless in a case infinitely stronger than this,) to permit its own speculations about causes and their effects, to countervail the testimony of witnesses, who, from experience and observation, must be peculiarly competent to speak upon the subject.

Being of opinion, therefore, that the only grounds upon which this injunction can be supported have been removed by the answer and evidence, it must be dissolved, and an order will be passed accordingly.

It was objected by one of the counsel for the defendant, that this injunction could not be maintained, because the bill was not under the corporate seal, nor verified by the proper officer of the company. Assuming this objection to be now in season, I do not think it a good one. The answer of a corporation is put in without oath under its corporate seal, but I do not find it any where said, that a bill filed by a corporation must be under its seal. That it is the bill of the corporation is suffici-

ently vouched by the signature of the solicitor, whose authority to file it need not be exhibited. 2 *Har. & Gill*, 374. The corporation could not swear to the bill, and I can see no good objection to the affidavit of the treasurer of the company. I think the truth of the facts set forth in the bill sufficiently verified by his affidavit, and that is all that is required. 1 *Bland*, 180.

[An appeal was taken from this order, but it was subsequently dismissed by the appellant.]