# BALTIMORE BUTCHERS ABATTOIR & LIVE STOCK CO., INC. *v.* UNION RENDERING CO.

[No. 64, October Term, 1940.]

118

*Decided January 3rd, 1941.*

The cause was argued before BOND, C. J., PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Joseph W. Starlings* and *Theodore R. Dankmeyer,* with whom were *Niles, Barton, Morrow & Yost* on the brief, for the appellant.

*J. Morfit Mullen* and *R. Contee Rose,* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

The object of this appeal is to construe a lease for the purpose of determining whether the Circuit Court of Baltimore City was justified in granting an injunction against the lessor.

On September 1st, 1934, Baltimore Butchers Abattoir & Live Stock Company, appellant, leased two of its buildings on West Franklin Street in Baltimore to Union Rendering Company, appellee, for a period of five years, with the privilege of renewal for five additional years. The appellant agreed to furnish steam for heating the buildings and also for the rendering operations. The tenant covenanted that it would not use the premises for "the purposes other than those of a rendering (fertilizer) factory and for the storage of hides."

In 1936 the tenant began to experiment in the manufacture of a feed with the trade-name of Molasses Meal, but it was not successful; in 1938 it began the manufacture of a feed under the trade-name of Nokako. The landlord has been continuously supplying steam to the cookers operated by the tenant, since the beginning of the tenancy under a prior lease in 1924. But in 1939, after a new president was elected for the appellant corporation, it requested the tenant to discontinue the manufacture of the feed, but the tenant refused. On February 22nd, 1940, it notified the tenant, purportedly in pursuance of the forfeiture clause, that since the premises were being used for "other than fertilizer operations" it would, after the expiration of five days, cut off the steam and re-enter and take possession of the premises. The tenant thereupon filed a bill for an injunction, and the court ordered a preliminary injunction to be issued upon the filing of a bond in the

penalty of $1000. After a hearing the court passed a final decree enjoining the landlord from cutting off the steam and from interfering with the tenant's possession of the premises, provided that the tenant made payments according to its agreement. The appeal is from that decree.

The solicitors for the appellant contended that the court below had no jurisdiction in the case. But it has long been recognized in this state that, while a fugitive or temporary trespass does not constitute ground for an injunction, equity will grant relief to a party when an injury would be ruinous to an estate which he is entitled to enjoy, and where full and adequate relief could not be obtained in the ordinary course of law. *Amelung v. Seekamp*, 9 G. & J. 468; *Georges Creek Coal & Iron Co. v. Detmold*, 1 Md. Ch. 371, 372. Justice Story wrote in his Commentaries: "Formerly, indeed, Courts of Equity were extremely reluctant to interfere at all, even in regard to cases of repeated trespasses. But, now, there is not the slightest hesitation, if the acts done, or threatened to be done, to the property, would be ruinous or irreparable, or would impair the just enjoyment of the property in future. If, indeed, Courts of Equity did not interfere in cases of this sort, there would * * * be a great failure of justice in the country." 2 *Story, Equity Jurisprudence,* sec. 928.

The writ of injunction is now frequently used by American chancery courts to prevent breaches of covenants. When, for instance, a landlord threatened to evict a tenant in Massachusetts, the Supreme Judicial Court held that the tenant should not be refused relief in equity on the ground that an injunction would cause the landlord a loss which would not be commensurate with the benefit to the tenant. Justice Holmes declared, in the opinion of the court: "If * * * the defendant has been at some expense already on the plaintiff's premises, we see no reason to doubt that it has acted with knowledge of the plaintiff's rights. * * * The defendant's outlay does not better its case on the question of a prohibitory in-

junction, and we see no reason why it should not be required to restore the premises to their original condition." *Lynch v. Union Institution for Savings,* 158 Mass. 394, 33 N. E. 603.

In Maryland it has been definitely decided that it is within the sphere of equity jurisdiction under appropriate circumstances to protect a lessee's interest by enjoining others from interfering with him in the enjoyment of the premises when an action at law would not afford him an adequate remedy, or when he would otherwise be required to resort to actions in ejectment and in tort to obtain redress for the wrongs committed. *Chesapeake Brewing Co. v. Mt. Vernon Brewing Co.,* 107 Md. 528, 68 A. 1046. Likewise, we have held that a landlord should be allowed relief in equity by enjoining the tenant from converting leased premises to uses inconsistent with the terms of the lease. *North Avenue Market v. Keys,* 164 Md. 185, 164 A. 152. It has been held that an unauthorized act of a landlord may be both a breach of covenant, for which the tenant might seek injunctive relief, and also an injury for which he might bring an action in tort. If the tenant remains in possession, he may seek relief against the landlord to restrain threatened continuous trespasses or other interference with him as a tenant because such acts are wrongful invasions of his rights; but if the lease should expire during the course of the proceedings, the tenant cannot then obtain an injunction, although he may still have a cause of action against the landlord for damages. *Winchester v. O'Brien,* 266 Mass. 33, 164 N. E. 807. In the case before us the lease has been duly renewed from September 1st, 1939, to August 31st, 1944, and the tenant is still in possession of the premises. The appellant has threatened to cut off the steam and terminate the lease. If the landlord carried out this threat, the tenant declares it would suffer irreparable damage, inasmuch as steam is necessary and vital for its business and there are no facilities for supplying steam at the plant.

The solicitors relied upon the familiar principle that equity, although willing to grant relief from a forfeiture as a result of failure to pay rent, will ordinarily refuse to prevent a forfeiture arising from breaches of covenants such as to make repairs, to insure against fire, and against sub-leasing without the consent of the lessor. 1 *Pomeroy, Equity Juris.*, sec. 454; *South Penn. Oil Co. v. Edgell*, 48 W. Va. 348, 37 S. E. 596. They cited an Alabama Case, *Cesar v. Virgin*, 207 Ala. 148, 92 So. 406, wherein a lessee had sub-leased property without the lessor's consent for purposes prohibited by the lease, and the court therefore refused to give relief from the operation of the forfeiture. But we should distinguish between a suit to restrain the violation of a lease, as in the case at bar, and a suit to prevent a forfeiture resulting from breach of covenant, as in the Alabama case.

The principal question for consideration is whether the manufacture of Nokako can be considered as a use contrary to the purposes of a rendering factory and therefore a breach of covenant. In making the feed the tenant impregnates the meat scrap or crackling with grain and molasses. The appellant claims that the tenant is strictly confined to the cooking of fats, bones, and offal, and the extraction therefrom of meat scrap, greases, and other tankage, and has no right to add the grain and molasses. It is a cardinal principle in the construction of covenants that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself. But if the meaning is not clear, the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources. *Phoenix Pad Mfg. Co. v. Roth*, 127 Md. 540, 543, 96 A. 762; 14 *Am. Jur., Covenants, Conditions and Restrictions*, sec. 7. In the present case the parties had made two leases before the lease in dispute. On August 20th, 1924, six days before the first lease was executed, the Union Rendering Company was

incorporated under the laws of Maryland. The certificate of incorporation, approved by the State Tax Commission, declares that the purposes of the corporation and the business to be carried on by it include not only the rendering of fats, oils, and bones and tankages of all kinds, but also the production and the sale of "any and all products and by-products thereof in any way derived therefrom * * * and all products and materials from which such by-products are produced or which are used in the production thereof." Moreover, it is very significant that the appellant's own insurance policies stipulated that the premises could be occupied for the purposes of "cattle and poultry feed manufacturing" as well as for offal cooking.

It is also a fundamental rule that, since restrictions are in derogation of conveyances and repugnant to trade and commerce, restrictive covenants are not favored by the courts, but should be strictly construed against the parties seeking to enforce them. A restrictive covenant should not be extended by implication beyond its original intent to include anything not clearly expressed in the conveyance, and, if there is ambiguity in its meaning, any doubt should be resolved in favor of the unrestricted use of the property, if it reasonably can be done. The burden rests upon the party relying on a restrictive covenant to bring himself within its terms. *Stevenson v. Spivey,* 132 Va. 115, 110 S. E. 367; *Neekamp v. Huntington Chamber of Commerce,* 99 W. Va. 388 129 S. E. 314, 317; *Bolin v. Tyrol Investment Co.,* 273 Mo. 257, 200 S. W. 1059. The solicitors for the appellant laid stress on the word "fertilizer" in the covenant that the tenant would not use the premises for purposes other than those of a "rendering (fertilizer) factory." But evidently the draftsman of the lease inserted this word parenthetically to give the denotation of a "rendering factory" by the use of a familiar word in the nature of a synonym, since the products of such factories are commonly used as ingredients of fertilizers. Indeed, the building in which the rendering is done is commonly known at the abattoir

as the "fertilizer building." But Benjamin J. Kavanaugh, president of the Union Rendering Company, swore in the court below that his company had never made any fertilizer on the premises, but had been making the feed, meat scrap, tallow, and greases. The same equipment is used in making Nokako as in making the other products. He testified: "The business is an entirety, no separate business. There is one company, Union Rendering Company. We make our crackling, and sell our crackling and Nokako to the same people."

Since the manufacture of the cattle and poultry feed requires the reduction of animal fats and bones, it must be considered within the purposes of a rendering factory. Under the provisions of the lease, the landlord must furnish steam for the rendering operations, without any limitations upon the types of rendering operations; while the tenant is authorized to use the premises not for the purpose but for the purposes of a rendering factory. According to the record, the manufacture of Nokako constitutes only about ten per cent of the company's business, and the time required for cooking it is much shorter than the time consumed in rendering offal. Before a court holds that a lease has been forfeited, it must clearly appear that a covenant has been violated. Thus, where a lease in Massachusetts stipulated that the premises were "to be occupied for the same purposes they now are," and the premises were then being used for the manufacture of carpetbags, the Court held that the use of the premises by the tenant for the manufacture of caps was not such a change of purpose as constituted a breach of the instrument entitling the lessors to re-enter. *Shumway v. Collins,* 6 Gray, (Mass.) 227. The court holds that the making of feed is not contrary to the purposes of a rendering factory. 14 *Am. Jur., Covenants, Conditions and Restrictions,* sec. 206, 212.

It should be aded that although the officers and employees of the appellant corporation have known since 1936 that the tenant has been using the premises to make

the feed, they continued to supply steam for that purpose and never made any objection until 1939. It is an ancient doctrine both in England and the United States that, since forfeitures for breaches of covenants are not favored, any slight acquiescence in a breach will be construed as a waiver of the forfeiture. *Bedford v. British Museum Trustees* 2 *Mylne & K.* 552, 6 *R. C.* 402, 15 *Eng. Rul. Cas.* 280; 35 *C. J., Landlord and Tenant*, sec. 252, 253, 254. Thus, where a tenant operating a motion picture theater complained that his landlord had violated a covenant for quiet use and enjoyment by annoying patrons of the theater with odors from the basement and noises from a restaurant in another part of the building, the court held that the unqualified payment of rent for seven months constituted a waiver of any rights he might have had to treat the annoyances as a breach of covenant. *Toy v. Olinger,* 173 Wis. 277, 181 N. W. 295. The acquiescence of the landlord in a breach of covenant for a period of three years would operate as a waiver of the breach. *Morrison v. Smith,* 90 Md. 76, 83, 44 A. 1031.

*Decree affirmed, with costs.*